# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3734

_____

United States of America,

        Appellee,

v.

Byron Farrington,

        Appellant.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* Southern District of Iowa.
\*
\*
\*

_____

Submitted: May 23, 2007
Filed: August 24, 2007

_____

Before BYE and SMITH, Circuit Judges, and NANGLE,[1] District Judge.

_____

SMITH, Circuit Judge.

Byron Farrington was convicted of 34 counts of wire fraud, in violation of 18 U.S.C. § 1343. The district court[2] sentenced Farrington to 63 months' imprisonment and ordered him to pay $258,566.76 in restitution. Farrington appeals, arguing that the court improperly allowed prejudicial evidence outside the scope of the indictment, that

---

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

the court erred in calculating the loss and restitution amounts, and that his sentence is unreasonable. We affirm.

## I. *Background*

Farrington formed Converge Now, LLC in August 2002, as a start-up wireless Internet service provider for the Midwestern United States. Farrington represented that Converge Now had an agreement with American Tower Company to lease tower space from dozens of towers to transmit Converge Now's wireless signal throughout the relevant coverage area. Converge Now advertised its services in the *Des Moines Register* and with various radio stations in Des Moines, Iowa, and St. Louis, Missouri,[3] in late 2002 and expanded its advertising into radio markets in Oklahoma City, Kansas City, Dallas, and Chicago in early 2003.[4] Potential customers were told that Converge Now subscribers would begin receiving wireless Internet service within 30 days after payment of a one-time equipment installation fee of $250.00 and the first month's service fee of $29.95 were paid.

Converge Now accepted payment from hundreds of subscribers, mostly by credit card, but later only two customers that actually received wireless service could be confirmed. In fact, Converge Now had never obtained a tower lease agreement with American Tower Company, or any other tower company, and was incapable of providing the services it advertised. Moreover, Converge Now double or triple-billed many subscribers' credit cards for the undelivered wireless services. After complaints, some subscribers received refunds from Converge Now, and others received a

---

[3]Farrington contracted with a St. Louis broadcasting company to run Converge Now radio ads on four St. Louis area radio stations between December 3, 2002, and December 13, 2002, for a total price of $26,450. The broadcast company began running the ads, but subsequently pulled them after Converge Now checks totaling $20,995 for the ads were returned for insufficient funds.

[4]The radio ads in each of these cities were also pulled after checks to each broadcast company were returned for insufficient funds.

"charge-back" or reimbursement to their credit cards by the merchant account holders that processed Converge Now's credit card transactions. But, many subscribers never recouped their subscription and service fees. In addition, Converge Now's merchant account holders sustained losses as a result of Farrington's failure or refusal to reimburse them for the subscriber charge-backs.

Converge Now billed approximately 500 customers for wireless Internet service that it never provided.[5] Additionally, the government presented evidence that Converge Now failed to pay certain equipment suppliers and radio advertisers. The government brought charges on behalf of 14 of the individual Converge Now subscribers whose credit cards had been charged multiple times for unprovided services. The grand jury indicted Farrington on 36 counts of wire fraud, in violation of 18 U.S.C. § 1343. After a six day trial, the jury found Farrington guilty on 34 of the 36 counts.

At sentencing, the district court set Farrington's base offense level at 6, then applied four Guidelines enhancements, raising the offense level to 26. Specifically, the court added a 12-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G) because the loss was between $200,000 and $400,000; a four-level enhancement under § 2B1.1(b)(2)(B) because the offense involved 50 or more victims; a two-level enhancement under § 2B1.1(b)(9)(C) because the offense involved "sophisticated means"; and a two-level adjustment under § 3C1.1 for obstruction of justice because Farrington committed perjury during his trial. With a total offense level of 26 and a criminal history Category I, Farrington's Guidelines range was 63–78 months. The court sentenced Farrington to 63 months' imprisonment and ordered him to pay $258,566.76 in restitution.

---

[5]Of the approximately 500 subscribers that were charged for service that they never received, the government presented evidence, in the form of sworn responses from the subscribers, indicating that approximately 80 individuals had sustained losses that were not recouped from either Converge Now or the merchant account holders.

On appeal, Farrington makes three arguments for reversal. He argues that the district court erred: (1) in allowing prejudicial evidence outside the scope of the indictment; (2) in calculating the loss and restitution amounts; and (3) in imposing an unreasonable sentence.

## II. *Discussion*
### A. *Prejudicial Evidence*

Farrington contends that the district court erred in admitting evidence of unpaid vendors and certain unauthorized credit card charges. Farrington argued to the district court that the evidence pertained to uncharged conduct and was unfairly prejudicial. The district court overruled Farrington's objection under Rule 403 of the Federal Rules of Evidence, finding that the evidence was relevant to the issues of knowledge and intent and that the evidence tended to show that Farrington could not provide the services he promised to provide in exchange for customer fees. The court determined that any prejudice created by the evidence was outweighed by its probative value.

Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is admissible but may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403. "Evidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning. Whether there was unfair prejudice depends on whether there was an 'undue tendency to suggest decision on an improper basis.'" *United States v. Looking Cloud*, 419 F.3d 781, 785 (8th Cir. 2005) (quoting *United States v. Sills*, 120 F.3d 917, 920 (8th Cir. 1997) (citations omitted)). "Simply because evidence is prejudicial does not mean that it must be excluded and great deference is given [to] the district court's balancing of the probative value and prejudicial impact of the evidence." *United States v. Ruiz*, 412 F.3d 871, 881 (8th Cir.

2005) (internal citation omitted). "We review the district court's decision to admit evidence for abuse of discretion." *Looking Cloud*, 419 F.3d at 785.

Farrington was charged with 36 counts of wire fraud. "The essential elements of wire fraud are a scheme to defraud, the use of interstate wires incident to the scheme, and an intent to cause harm." *United States v. Edelmann*, 458 F.3d 791, 812 (8th Cir. 2006). "Intent to defraud may be inferred from all the facts and circumstances surrounding the defendant's actions." *United States v. Schumacher*, 238 F.3d 978, 980 (8th Cir. 2001). Consequently, the challenged evidence was admissible as it tended to show that Farrington used Converge Now as a scheme to defraud and that Farrington had the necessary intent to commit wire fraud. Accordingly, giving deference to the district court's balancing of the probative value and prejudicial impact of the evidence, *Ruiz*, 412 F.3d at 881, we hold that the court did not abuse its discretion in admitting the challenged evidence. *See Schumacher*, 238 F.3d at 980 ("The mere fact that the evidence was unfavorable, is by no means so unfairly prejudicial as to be misleading and not aid and assist the jury in making a material determination in the case.") (internal quotations and citation omitted).

B. *Amount of Loss Enhancement*

Farrington also contends that the district court erred in enhancing his offense level based upon the amount of loss. The district court determined that the loss from the fraudulent scheme totaled between $200,000 and $400,000. Farrington avers that the court miscalculated the loss because it should have only used the amount of loss specifically listed in the indictment for the 34 counts for which he was convicted. "We review the district court's fraud loss findings for clear error; 'as long as the determination is plausible in light of the record as a whole, clear error does not exist.'" *United States v. Coon*, 187 F.3d 888, 899 (8th Cir. 1999) (quoting *United States v. Jackson*, 155 F.3d 942, 948 (8th Cir. 1998)). We note that under the advisory Guidelines scheme, sentencing judges are only required to find sentence-enhancing

facts by a preponderance of the evidence. *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006).

Guidelines § 2B1.1(a) establishes a base offense level of 6 for Farrington's convictions, but § 2B1.1(b)(1)(G) mandates a 12-level enhancement if the loss is between $200,000 and $400,000. The district court's loss determination does not have to be precise; the court only has to make "a reasonable estimate" of the loss. *United States v. Agboola*, 417 F.3d 860, 870 (8th Cir. 2005); *Scott*, 448 F.3d at 1044; U.S.S.G. § 2B1.1, cmt. n.3(C). "[W]e accord particular deference to the loss determination because of the district court's unique ability to assess the evidence and estimate the loss." *Scott*, 448 F.3d at 1044.

The loss estimate may be based on the approximate number of victims multiplied by the average loss to each victim. U.S.S.G. § 2B1.1, cmt. n.3(C); *Agboola*, 417 F.3d at 868. Also, the loss may be based on more general factors, such as the scope and duration of the fraud and the revenues generated by similar operations. *Id.* Or, if the amount of loss cannot reasonably be determined, the court may use the offender's gain from committing the fraud as an alternative estimate. *Id.* "The amount of fraud loss for sentencing purposes is the greater of the loss [the] defendant[] intended to inflict at the time of the fraud, or the actual loss." *Coon*, 187 F.3d at 899; U.S.S.G. § 2B1.1 cmt. n.3(A).

The district court based its $200,000 to $400,000 loss calculation on two evidentiary submissions. The court accepted the government's evidence establishing the amount of credit card charges Farrington ran through Converge Now's merchant accounts, and the court also took into account the losses sustained by the broadcast companies for Converge Now's unpaid radio advertising. We find that the district court's loss calculation properly included these sums because they flowed from Farrington's fraudulent Converge Now scheme, and Farrington intended the losses when he billed the charges. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). Because the district

court need only make a reasonable estimate of loss rather than a precise determination, *Agboola*, 417 F.3d at 870, and the district court's loss determination is plausible in light of the record as a whole, *Coon*, 187 F.3d at 899, we conclude that the district court's loss amount determination was not clearly erroneous.

## C. *Calculation of Restitution Amount*

Farrington also contends that the district court improperly calculated his restitution amount. The court ordered Farrington to pay $258,566.76 in restitution pursuant to 18 U.S.C. § 3663A(a)(1).[6] This amount included $167,586.70 for losses to the merchant account holders, $60,560.00 for losses to the broadcast companies, and $30,420.06 for losses to individual subscribers. "We review the district court's decision to order restitution for an abuse of discretion." *United States v. Pierce*, 479 F.3d 546, 553 (8th Cir. 2007). "The district court's factual determinations underlying an order for restitution are reviewed for clear error." *Id.* The government has the burden of proving the amount of restitution by a preponderance of the evidence. *Id.*[7] This standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970) (citation omitted).

Farrington asserts that the restitution amount was erroneously calculated because it included losses from unindicted conduct that was not proven to a jury beyond a reasonable doubt. We disagree. "In a wire fraud case, the jury must consider the existence of the fraudulent scheme as part of the charged conduct." *United States v. Ross*, 279 F.3d 600, 609 (8th Cir. 2002); *see also* 18 U.S.C. § 1343 (prohibiting the

---

[6]Section 3663A(a)(1) requires that a court order restitution when a defendant has been convicted of an offense against property, including any offense committed by fraud or deceit. 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii).

[7]We have determined that the evidentiary standard in restitution cases is unchanged by *United States v. Booker*, 543 U.S. 220 (2005). *Pierce*, 479 F.3d at 553, n.14; *United States v. Miller*, 419 F.3d 791, 792 (8th Cir. 2005)

use of interstate wires for the purpose of executing a scheme or artifice to defraud); *United States v. Edelmann*, 458 F.3d at 812 ("The essential elements of wire fraud are a scheme to defraud, the use of interstate wires incident to the scheme, and an intent to cause harm."). Thus, Farrington's fraudulent scheme was an element of the conduct charged in the indictment. *See Ross*, 279 F.3d at 609. "Our precedent makes clear that victim restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme." *Id.* (quoting *United States v. Ross*, 210 F.3d 916, 924 (8th Cir. 2000)).

Neither *Blakely* nor *Booker* affected this principle. *See United States v. Oslund*, 453 F.3d 1048, 1062 (8th Cir. 2006) (citing *United States v. May*, 413 F.3d 841, 849 (8th Cir. 2005) (finding "persuasive" the view of other circuits that have determined that *Apprendi*, *Blakely*, and *Booker* do not affect the determination of restitution amounts)); *see also United States v. Miller*, 419 F.3d 791, 792–93 (8th Cir. 2005). Here, the entire court-ordered restitution related to Farrington's fraudulent Converge Now scheme. Thus, the district court's inclusion of losses stemming from unindicted conduct in its restitution determination was not error. *See Ross*, 279 F.3d at 609.

Farrington argues on appeal, as he did at sentencing, that the government failed to establish a reliable loss amount because of potential double counting of losses sustained by individual subscribers who were later reimbursed by merchant account holders. The record, however, belies Farrington's claim. The government provided evidence at sentencing that the $258,566.76 amount did not include losses from any individual subscriber who had received a full refund or charge-back. Considering the evidence presented supporting the restitution amount, Farrington's mere assertion of potential double-counting, without any factual support, does not establish an abuse of discretion in determining the restitution amount.

D. *Reasonableness of Sentence*

The district court concluded that Farrington's Guidelines range was 63–78 months based upon his total offense level of 26 and his Category I criminal history, and it ultimately imposed a sentence of 63 months' imprisonment. Farrington argues that he should have received a sentence below his Guidelines range because of the nonviolent nature of his offense, his medical needs, and his need to support his family. Farrington also challenges the presumption of reasonableness this circuit, and the majority of others, have given to within Guidelines sentences.

"We review a sentence for unreasonableness, guided by the sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. Pizano*, 403 F.3d 991, 995 (8th Cir. 2005). "Sentences within the guideline range are 'presumptively reasonable.'" *United States v. Goldsmith*, 486 F.3d 404, 407 (8th Cir. 2007); *see also Rita v. United States*, ___ U.S. ___, 2007 WL 1772146 (June 21, 2007) (holding that courts of appeals may apply a presumption of reasonableness to a sentence imposed within the properly calculated Guidelines range). This "presumption, even if it increases the likelihood that the judge, not the jury, will find 'sentencing facts,' does not violate the Sixth Amendment." *Rita*, 2007 WL 1772146 at * 9.

A sentence within the Guidelines range may be unreasonable if the sentencing court: (1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment. *United States v. Haack*, 403 F.3d 997, 1004 (8th Cir. 2005). We review the reasonableness of a sentence for abuse of discretion. *United States v. Larrabee*, 436 F.3d 890, 892 (8th Cir. 2006).

The district court considered the nonviolent nature of Farrington's conduct, his medical needs, and his need to support his family. The court simply found these factors insufficient to warrant a sentence lower than the bottom of the Guidelines

range. The absence of violence does not diminish the seriousness of the offense committed because: (1) fraud-based offenses are often nonviolent, and (2) if violence had been involved, Farrington would likely have been subjected to increased punishment. *See United States v. Feemster*, 483 F.3d 583, 589 (8th Cir. 2007) ("The absence of grounds that justify further punishment is not a ground for a downward variance.").

The court also accounted for Farrington's health concerns when it recommended to the Bureau of Prisons that Farrington serve his sentence at a facility that could properly monitor his medical needs. *See Rita*, 2007 WL 1772146 at *14 (finding that the sentence imposed explicitly accounted for defendant's health by seeking assurance that the Bureau of Prisons would provide appropriate treatment). Further, on this record, Farrington's family support is not atypical and does not justify a below Guidelines sentence. A district court may depart from the Guidelines range if a defendant has significant family responsibilities such that incarceration would cause unusual harm. *See* U.S.S.G. § 5H1.6. But, it is a disfavored basis for departure, *see United States v. Bueno*, 443 F.3d 1017, 1023 (8th Cir. 2006), that is not triggered by the kind of family hardships that are ordinarily incident to incarceration. *See* U.S.S.G. § 5H1.6 cmt. n.1(B)(ii); *United States v. Gentile*, 473 F.3d 888, 893 (8th Cir. 2007); *United States v. Johnson*, 908 F.2d 396, 399 (8th Cir. 1990) (noting that "parents frequently are separated from children during periods of incarceration"). The district court did not find that the circumstances of Farrington's case presented unusual family circumstances that would justify a § 5H1.6 departure; nor did the court believe that the circumstances justified a downward variance under § 3553(a). We find the district court did not abuse its discretion in imposing the 63-month sentence on this record. Therefore, we hold that the sentence was reasonable.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____